IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

OUTREACH FOR ANIMALS, INC and )
KAREN THOMAS )
            )
      PLAINTIFFS )
            )
v. )         CASE NUMBER
            )         1:23-CV-02557-AT
NOAH'S ARK ANIMAL )
REHABILITATION )
CENTER AND SANCTUARY, )
INC., et al., )
GLENN ROSS and )
DR. MICHELLE LAKLY )
            )
      DEFENDANTS. )

## AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

1.    This is a citizen suit, brought by Outreach for Animals, Inc. ("OFA") and Dr. Karen Thomas ("Thomas") (collectively "Plaintiffs") pursuant to Section 11(g)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), to address ongoing violations of the ESA and its implementing regulations arising out of the operation of Noah's Ark Animal Rehabilitation Center & Sanctuary, Inc. ("Noah's Ark"), a Georgia nonprofit corporation; Chairman Glenn Ross ("Ross"); and Dr. Michelle Lakly, PhD, President ("Lakly") (collectively "Defendants"), located in Locust Grove, Henry County, Georgia.

2.     Noah's Ark operates an unaccredited roadside menagerie in Locust Grove, Georgia. Based upon the most recent publicly available animal inventory, Noah's Ark houses at least fifty-nine (59) animals, including thirty-one (31) ESA-protected animals (collectively, "the protected animals").

3.     Plaintiffs bring suit against Defendants for "taking" protected animals in violation 0f the ESA and its implementing regulations based on the improper care and unsafe and unsanitary conditions provided for five tigers, one lion, two spider monkeys, one Lar gibbon, one Lar gibbon-Siamang hybrid, five military macaws, four scarlet macaws, one yellow-crested cockatoo, eight white cockatoos, two salmon-crested cockatoos, and one grizzly bear housed at Noah's Ark. Documentation, including an Official Warning and citations for critical and repeat violations of the Animal Welfare Act (AWA), demonstrate that Defendants are depriving ESA-protected species of adequate veterinary care, forcing them to eat contaminated food, and depriving them of safe and sanitary living conditions. These failures violate the ESA.

4.     These practices "harm" and "harass" the protected animals in violation of the ESA's "take" prohibition by causing them death, pain, hunger, and discomfort in unsanitary conditions; exposing them to a high risk of illness and injury; failing to provide them adequate veterinary care;

distressing them; preventing them from carrying out their natural behaviors; impairing their mental development; and depriving them of proper environmental enrichment and psychological stimulation.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331.

6.    Plaintiffs provided notice of intent to sue Defendants on Wednesday, March 22, 2023, at least sixty days in advance of the filing of this Complaint, as required by the ESA. 16 U.S.C. § 1540(g)(2)(A)(i). Plaintiffs mailed to Defendants, the Secretary of the Interior, and the Director of the U.S. Fish and Wildlife Service ("FWS") a notice of violation and intent to file suit ("Notice of Intent"), attached hereto and incorporated herein as Exhibit A. More than sixty days have passed since the Notice of Intent was served on Defendants and these agencies.

7.    Defendants have not remedied the violations set out in the Notice of Intent.

8.    The Secretary of the Interior has not commenced an action against Defendants to impose a penalty pursuant to the ESA or its implementing regulations, and the United States has not commenced a criminal prosecution against Defendants to redress a violation of the ESA or its implementing regulations.

9.    Venue is appropriate in the Northern District of Georgia, pursuant to 16 U.S.C. § 1540(g)(3)(A), because the violations of the ESA set forth herein occurred, and continue to occur, within this judicial district.

## PARTIES

10.    Plaintiff Outreach for Animals, Inc., is an Ohio nonprofit corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code, with its headquarters located in Dayton, Ohio.

11.    Plaintiff Dr. Karen Thomas was associated with Noah's Ark; she served as the USDA-APHIS designated Attending Veterinarian for the animals sanctuaried at the Noah's Ark facility for decades until terminated by Defendants.

12.    Dr. Karen Thomas derives person, recreational, education and aesthetic benefits from being in the presence of animals and observing animals in humane conditions. In addition to her professional training as a veterinarian, she has a personal interest in animals and the humane treatment of same. It is her affinity for animals that lead her to train as a healer for same.

13.    Early in her association with Noah's Ark, before she was formally employed by Noah's Ark, Dr. Thomas treated the animals who were rescued there. She routinely neutered, spayed and treated the rescued

animals for free.

14.    Dr. Thomas, not initially trained to treat "exotic animals", developed an expertise in several different species of animals that found home at Noah's Ark. She learned to deal with the health and dietary issues unique to some of the animals residing at Noah's Ark. She was responsible not only for caring for the animals when they fell ill, but also for overseeing their general health.

15.    Karen Thomas also developed close personal relationships with the animals at Noah's Ark. She had frequent contact with the animals housed at Noah's Ark. Over the many years that she had contact with these animals (including all of the animals that are the subject of this suit), she learned the individual personalities of the animals.

16.    Beginning with the installation of the new management of Noah's Ark, Karen Thomas began to become concerned with the conditions surrounding her patients and animal friends. The new management, especially Glenn Ross and Michelle Lakly, prevented Dr. Thomas from providing proper care for the animals, disregarded her professional advice related to care and feeding of the animals and prevented her from attending to those animals.

17.    Karen Thomas experienced distress and anguish as a result of her observation of animals held in unhealthy, inhumane and harmful

conditions; some of these animals engaged in abnormal behaviors that indicated they were in psychological distress. The conditions under which the animals were kept at Noah's Ark seriously impaired her aesthetic enjoyment of the animals.

18.    Karen Thomas personally observed the consequences of the failure to provide the proper care and food to the animals she had come to love. Those consequences, in the form of inhumane conditions and deteriorating health (and sometimes death) of those animals is described in greater detail below.

19.    Because she appreciates and is attached to the particular animals at Noah's Ark and is concerned about their welfare, Karen Thomas wishes to see the animals in a healthy environment and to avoid seeing them in inhumane, harmful conditions. Defendants' confinement of the animals in inhumane conditions harms Karen Thomas' aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for animals at Noah's Ark. In additional, based on her experience as a veterinarian, Dr. Thomas is concerned about both the animal and human injury and illness including without limitation, the public safety risks from the uncontrolled virus outbreak, inadequate enclosure fencing, and poorly controlled

interaction between humans and animals.

20.    Karen Thomas continues to monitor conditions at Noah's Ark. She was extremely upset when she watched the recent videos detailing the inhumane conditions at Noah's Ark.

21.    Karen Thomas would like to observe and visit the animals currently at Noah's Ark. If the animals were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in humane conditions, Karen Thomas would visit them.

22.    Plaintiff OFA is dedicated to protecting animals, including animals used in entertainment, from abuse, neglect, and cruelty. OFA's goal is to "continue to be the number one advocate for proper behavior around wildlife by bringing greater understanding of wildlife to the general public through a national presence with lectures, programs, educational materials, and experience." OFA is always committed to acting as the goodwill ambassador and liaison between humans and animals.

23.    To achieve its objectives of ending the abuse and neglect of animals subjected to human contact, OFA uses public education, cruelty investigation, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals. It brings this suit on its own behalf to protect its organizational resources.

24.    By unlawfully harming and harassing endangered species, Defendants directly frustrate OFA's mission to eliminate the use and abuse of animals by improper behavior of humans. Unlawfully harming and harassing endangered species increases the acceptability of poor human behavior, subjecting animals to more abuse and neglect. If OFA prevails in this action, Defendants will no longer be able to maintain endangered species in unlawful conditions, and their use and abuse of endangered species will come to an end.

25.    Continuing to harm and harass the endangered tigers at Noah's Ark without repercussion under the ESA also creates the incorrect public impression that Defendants — and, more generally, similar non-GFAS accredited sanctuaries — are engaged in conduct that is consistent with animal welfare. Defendants' conduct is not acceptable, not consistent with animal welfare, and constitutes animal abuse, mistreatment or neglect. This public misimpression is amplified by the media attention everything is under control at Noah's Ark because of the new leadership's direction, which is a total farce. This frustrates OFA's mission by making it harder to persuade the public that it should not tolerate the unsanitary conditions and abusive actions towards animals at Noah's Ark. If OFA prevails in this action, (a) OFA will not have to counteract the misimpression, and (b) it will be easier for OFA to educate the public that Defendants' practices

are inconsistent with the ESA and animal welfare.

26.    The considerable media attention that Noah's Ark remains operational without repercussions from anything more than warnings from the federal, state, and local agencies creates significant incentives for other facilities to start skirting the regulations that are meant to protect both humans and animals. This frustrates OFA's mission by showing a lack of enforcement which creates the impression that the laws will not be enforced or facilities are able to cut corners since there will be less likelihood of prosecution. If OFA prevails in this action, other facilities will be discouraged from violating the regulations protecting endangered species and the safety of human beings and those same animals.

27.    OFA also regularly conducts investigations, helps prosecute, and provides education and community talks about rescuing animals from inhumane and abusive situations, and rehoming them to reputable facilities. Since 2001, OFA has operated as a nonprofit organization carrying out its charitable purpose but also completing the required executive and administrative corporate work.

28.    OFA's mission was impaired by Defendants' abuse and neglect of endangered species at the Noah's Ark facility in Georgia. OFA's President, Tim Harrison, was dispatched to investigate Defendants' new leadership

in charge of the animals and facility. While investigating Defendants for violations of federal, state, and local animal welfare laws, OFA incurred many losses, diverting its resources from the charitable and educational budgets to an investigation and pursuit of civil enforcement.

29.    Tim Harrison, OFA's President, was absent from its June 2022 Board Meeting, disrupting and diverting OFA's time, business, and other resources. Between July 28, 2022 and August 1, 2022, OFA diverted resources from educating the public about proper behavior around animals to conduct a safety concern and sanctuary walkthrough of Noah's Ark's facility and a safety check of its animals. OFA's resources were expended in time taken on Zoom call meetings on August 3, 2022 and August 16, 2022 regarding the safety concerns and conditions of Noah's Ark and its animals.

30.    On October 19 and 20, 2022, OFA was required to expend resources and divert them in order to participate as an expert witness in a Georgia state action for a temporary restraining order and a preliminary injunction.

31.    In April of 2023, OFA produced and created content for videos  regarding investigations into the safety concerns and checks on big cats, primates, parrots and a bear at Noah's Ark's facility. The resources that were to be used for public education are now being used for

documentation of violations of the Endangered Species Act.

32.    By Defendants engaging in a regular disregard for the safety and welfare of endangered species at the Noah's Ark facility, OFA must continue to divert resources to combat the negative impressions.

33.    As a result, Plaintiff OFA have been forced to divert resources to counteract Defendants' unlawful activities. OFA has been forced to divert these resources from its other animal rescue, cruelty investigation, advocacy, and education projects.

34.    If Plaintiff OFA does not prevail in this action, Noah's Ark and other exhibitors will be encouraged by Noah's Ark ability to cut corners in violation of the regulations, and Plaintiff OFA will have to continue to divert resources to counteract Defendants' unlawful activities.

35.    Again, continuing to harm and harass the endangered animals at Noah's Ark without repercussion under the ESA creates the incorrect public impression that Defendants— and, more generally, similar animal sanctuaries — may:

    a.   abuse, neglect, and mistreat ESA-protected animals;

    b.   deprive tigers and a lion of veterinary care and adequate nutrition;

    c.   feed tigers contaminated food;

    d.   force tigers and protected bears to live in unsanitary conditions;

e.  fail to prevent tigers and a lion from exposure to potentially deadly avian influenza virus;

f.  force nonhuman primates and tigers to live in unsafe and unsecure enclosures;

g.  fail to protect ESA-listed psittacines from a high infection risk from a highly pathogenic avian influenza;

h.  fail to provide adequate staffing and care for ESA-protected animals;

i.  physically abuse a spider monkey; and

j.  fail to have an adequate program of veterinary care for ESA-protected animals.

36.  This impairs Plaintiff OFA's activities by making it harder for Plaintiff OFA to educate the public that the conditions at facilities like Noah's Ark, in fact, harm and harass endangered animals.

37.  If Plaintiff OFA prevails in this action, the public will learn that Defendants' practices are inconsistent with the ESA and animal welfare, and Plaintiff OFA will no longer have to divert resources to investigate abuse and neglect of endangered species, cruelty investigations, educating the public, and to counteract the incorrect public impression caused by Defendants' unlawful acts.

38.  Plaintiffs' additional efforts and the resulting expenditures would not be necessary but for Defendants' unlawful taking of endangered

animals.

39.    Defendant Noah's Ark Animal Rehabilitation Center & Sanctuary, Inc. ("Noah's Ark"), is a Georgia nonprofit corporation with its headquarters in Locust Grove, Georgia.

40.    Defendant Glenn Ross is the Chairman of the Board of Directors of Noah's Ark. He is a resident of the state of Georgia, over the age of 18, and resides at 2495 King's Arm  Point, Atlanta, Georgia 30345.

41.    Dr. Michelle Lakly is the President of Noah's Ark. She is a resident of the state of Georgia, over the age of 18, and resides at 386 Pylant Street, Senoia, Georgia 30276.

## STATUTORY BACKGROUND

42.    The ESA defines an "endangered species" as "any species which is in danger of extinction." 16 U.S.C. § 1532(6).

43.    Section 9 of the ESA prohibits the "take" of any endangered species. *Id.*§ 1538(a)(1)(B).

*44.*    The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C.§ 1532(19). The term "harm" includes an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an

endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

45.    Under the ESA, it is unlawful to possess any endangered species that has been unlawfully taken in violation of Section 9(a)(1)(B). 16 U.S.C. § 1538(a)(1)(D).

46.    The ESA's prohibitions apply to endangered animals held in captivity as well as those in the wild. *See*, *e.g.*, 78 FR 33790, 33792 (June 5, 2013) ("The Act does not allow for captive-held animals to be assigned separate legal status from their wild counterparts on the basis of captive state.").

47.    The ESA authorizes the Secretary of the Interior to issue a permit for any act that is otherwise prohibited by 16 U.S.C. § 1538, but only if such act is "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A).

48.    The ESA allows citizens to bring suit to enjoin "any person who is alleged to be in violation" of the "take" provisions of the statute. 16 U.S.C. § 1540(g)(1)(A).

## FACTUAL BACKGROUND

49.    Noah's Ark operates an unaccredited roadside menagerie in Locust Grove, Georgia. Based upon the most recent publicly available animal

inventory, Noah's Ark houses at least fifty-nine (59) animals, including thirty-one (31) ESA-protected animals (collectively, "the protected animals"): Five (5) tigers; One (1) lion; Two (2) spider monkeys; One (1) Lar gibbon; One (1) Lar gibbon-Siamang hybrid; Five (5) military macaws; Four (4) scarlet macaws; One (1) yellow-crested cockatoo; Eight (8) white cockatoos; Two (2) salmon-crested cockatoos; and One (1) grizzly bear.

50.    Noah's Ark has been embroiled in litigation and controversy over the adequacy of its new leadership and board of directors for nearly a year and has been the subject of a Georgia Department of Natural Resources investigation due to an outbreak of Avian influenza at Noah's Ark in 2022. There was also an investigation by the Georgia Department of Agriculture.

51.    Amid changes in leadership, confusion about staffing and veterinary care, at least one serious injury happened to an untrained employee while giving medicine to a bear, and former employees complaining of unsafe working conditions, the tigers, lion, and other federally-protected animals have been left to languish without veterinary care, forced to live in substandard and unsanitary conditions, deprived of adequate enrichment, recklessly exposed to Avian influenza which is known to be transmissible to big cats and can indeed be fatal to them, and forced to eat contaminated food. These conditions constitute illegal takes of the protected animals in violation of Section 9 of the ESA.

52.    Section 9's "take" prohibitions apply to all members of the listed species, whether living in captivity or the wild. FWS regulations under the ESA underscore that "the [ESA] applies to both wild and captive populations of a species" and federal courts have repeatedly applied the ESA's take provision against numerous roadside zoos that have subjected tigers, lions, and other protected species to substandard care that is substantially similar to the documented conditions at Noah's Ark.

## DEFENDANTS' ESA VIOLATIONS

### A.    DEFENDANTS HARM AND HARASS PROTECTED SPECIES BY DEPRIVING THEM OF VETERINARY CARE AND ADEQUATE NUTRITION.

53.    On September 15, 2022, USDA Veterinary Medical Officer (VMO) Dr. Stephanie Mayard and VMO Dr. Kurt Hammel inspected Noah's Ark and cited the facility for violations of ten different AWA regulations. Dr. Mayard notes in the inspection report that Noah's Ark was not providing Sheila the tiger with ongoing veterinary monitoring of arthritis and gait deficits. Dr. Mayard noted that Noah's Ark "has failed to provide APHIS officials with required information per the regulations as to who their attending veterinarian is. There are several animals that have pre-existing or new conditions needing care or ongoing monitoring."

54.    Dr. Mayard further noted that "[r]eliable and consistent veterinary care cannot be guaranteed" under the circumstances at Noah's

Ark and documented disagreement between board members about whether the facility ***still even had an attending veterinarian***. As the report notes: "At least two members of the board at the head of the facility believe the previous attending veterinarian continues to have authority over the care of the animals. At least three other members believe the previous attending veterinarian no longer holds that position. When asked, the previous attending veterinarian was not sure either if she still held the position and described situations over the last month, [sic] where she encountered resistance as well as interference from the facility in allowing her to visit the grounds and care for the animals."

55.    On December 15, 2022, VMO Stephanie Mayard returned to Noah's Ark with VMO Dr. Madeline Anna and documented that the tiger Sheila had lesions on her left hind limb that had not been treated. Dr. Mayard also documented Sheila's ongoing gait deficits and difficulty walking. Dr. Mayard noted that "A facility representative and the attending veterinarian have both expressed experiencing a lack of responsiveness from the other on aspects relating to animal care" and that Noah's Ark's lack of critical communication with the attending veterinarian and "a more rigorous and effective mechanism of direct and frequent communication must be established so that timely and accurate information on problems of animal health, behavior, and well-being is

conveyed to the attending veterinarian."

56.    Dr. Mayard also noted that Noah's Ark was feeding tigers and lions in a way that was not reviewed or approved by the attending veterinarian. Noah's Ark had failed to engage the attending veterinarian in approval of the dietary composition or supplements fed to "any of the wild cats housed at the facility." Dr. Mayard further noted that "the facility is underdosing the wild cats" with the carnivore supplement that provides big cats with calcium and other important nutrients. The inspector noted that the tiger Sheila is "being given less than half the required amount of supplement even though she is being given a bone-less diet .... This supplement is the main source of calcium for Sheila, yet she is being given a severely low dose for her requirements. The bone content in the diet as well as the amount of supplement added for each animal was not discussed with or approved by the attending veterinarian."

57.    Courts have ruled that depriving ESA-protected species of adequate veterinary care, including by failing to ensure services of a veterinarian with sufficient training or experience for each species, and deprivation of adequate nutrition, harms and harasses them and constitutes an illegal take in violation of the ESA.

### B.    DEFENDANTS HARM AND HARASS TIGERS BY FEEDING THEM CONTAMINATED FOOD.

58.    On September 15, 2022, USDA VMO Stephanie Mayard observed

Sheila the tiger eating pieces of raw meat "completely covered in ants. Many flies were also seen laying on top of the raw meat. The contaminated meat was the only source of food for this tiger at the time." The inspector further noted that "eating contaminated food could result in illness and may compromise the health of the animals."

59. Depriving protected species of adequate nutrition and forcing them to eat contaminated food has been interpreted as "appalling cruelty" and constitutes an illegal take in violation of the ESA.

**C. DEFENDANTS HARM AND HARASS TIGERS AND A BEAR BY FORCING THEM TO LIVE IN UNSANITARY CONDITIONS.**

60. The critical violation of the AWA issued to Noah's Ark on September 15, 2022, further noted that "the den for the tiger Sheila contained a large amount of soiled straw bedding. The center of the den was black in color …Per a facility representative, the dens for the tigers and bears have not been cleaned out since they are awaiting an order of straw…."

61. The USDA inspector noted that "failure to adequately clean the dens and remove soiled bedding within, [sic] may result in animal reluctance to enter the shelter during inclement weather. Animals encountering soiled bedding could also result in coat contamination as well as skin irritation."

62. Forcing protected species to live in unsanitary conditions is an illegal take in violation of the ESA.

### D. DEFENDANTS HARM AND HARASS NONHUMAN PRIMATES AND TIGERS BY FORCING THEM TO LIVE IN POTENTIALLY HAZARDOUS CONDITIONS

63. During the September 15, 2022, inspection, Dr Stephanie Mayard noted exposed containers of disinfectant and detergent on shelving that did not have doors or a cabinet for enclosed storage. As noted in the inspection report, such substances can be toxic or harmful if animals are exposed to them.

64. Without enclosed storage, there are insufficient means to prevent a chemical spill from coming into contact with the animals. This is the same kitchen/primate indoor housing area that nonhuman primates later escaped into. A photo taken from December 28, 2022, while those escaped primates were in the kitchen area, clearly shows a capuchin monkey chewing a container and a spider monkey with its back turned to the camera.

65. On December 15, 2022, USDA VMO Dr. Stephanie Mayard noted that enclosures for tigers are in substantial disrepair such that downed trees, overgrowth, and damaged fencing "presents a safety risk to the animals within the facility" because the facility has failed to adequately hold animals or maintain enclosures in good repair to "keep unauthorized

persons out."

66.    Failing to maintain the premises and enclosures in good repair and in such a way that animals are protected from unsafe conditions harms and harasses the protected species in violation of the ESA.

**E.    DEFENDANTS HARM AND HARASS ESA-LISTED PSITTACINES BY FAILING TO MITIGATE A HIGH INFECTION RISK FROM HIGHLY PATHOGENIC AVIAN INFLUENZA.**

67.    The U.S. is experiencing the worst outbreak of highly pathogenic avian influenza in history. This current outbreak has been confirmed in over 784 commercial flocks in 47 states, involving 58.49 million birds across the US (as of 3.6.2023). The current outbreak is also showing an unprecedented predisposition to move between birds and mammals, with 17 species of wild mammal having confirmed cases in the US from this outbreak, including bears and tigers.

68.    Avian influenza is a high-risk virus, causing 100% mortality in some species of birds. The current outbreak is caused by the Eurasian strain of H5N1 Influenza. H5N1 Influenza has been identified in parrots. Noah's Ark had a Highly Pathogenic Avian Influenza Management Plan in place prior to the August 2022 outbreak that was based upon recommendations from USDA-APHIS for management of this virus in captive wild birds.

69.    Noah's Ark president Shelly Lakly suspended Animal Husbandry

Manager Allison Hedgecoth on August 7, 2022, as the first vultures were noted as dying on August 8, 2022, removing the person most familiar with protocols and in direct communication with the attending veterinarian for a disease outbreak such as this. Instead of taking immediate action, over 700 wild vultures died at Noah's Ark risking infection to all animals, including parrots, big cats, primates, and the grizzly bear, from exposure to feces, dying birds, and carcasses that were left to rot by President Lakly. This is despite guidelines from the Georgia Department of Agriculture (GDA) to immediately report sick birds.

70.    This failure to act swiftly and efficiently at the initial signs of an avian influenza outbreak also resulted in a mandatory depopulation of over 100 birds and a months long quarantine by the Georgia Department of Agriculture as a means of trying to control the outbreak.

71.    The reckless, cavalier behavior of the current Noah's Ark management has towards the risks associated with avian influenza harasses the protected species in violation of the ESA take prohibition.

F.    **DEFENDANTS HARM AND HARASS PROTECTED PSITTACINES BY FAILING TO MEET THEIR UNIQUE CLIMATIC NEEDS.**

72.    Noah's Ark specifically houses 4 scarlet macaws, 5 military macaws, 8 white cockatoos, 2 salmon crested cockatoos and 1 lesser sulfur crested cockatoo. Each of these animals are ESA protected birds. Parrot

escapes occurred while under GDA quarantine, risking a higher level of avian influenza exposure for these birds. A female scarlet macaw remains unaccounted for as Dr. Thomas was terminated while attempting to count birds 3 days after the tornados in January 2023.

73.    Additionally, these birds were not provided adequate protection from the wind and weather or supplemental heat as temperatures dropped below 50 degrees during the winter months to ensure their health and well-being. This failure to provide adequate shelter includes an especially severe time of inadequate shelter and heat during record cold temperatures. Failure to provide appropriate protection from the elements and cold weather led to the death of at least 13 parrots during a three day extremely cold period in December 2022.

74.    ESA-protected birds were forced to endure the same cruel conditions as those who died. Subjecting protected species to inadequate shelter from the elements, extreme temperatures, and inclement weather harms and harasses them in violation of the ESA.

**G.    DEFENDANTS HARM AND HARASS PROTECTED BIG CATS, BEAR, AND PRIMATES BY FAILING TO TAKE ADEQUATE PRECAUTIONS TO PROTECT THEM FROM AN OUTBREAK OF AVIAN INFLUENZA.**

75.    It is widely known that numerous cases of avian flu have been documented in big cats and bears in the U.S. and that avian flu is also transmissible to nonhuman primates.

76.    On September 15, 2022, the USDA cited Noah's Ark for ten AWA violations, including a *critical* violation of the AWA for the facility's failure to remove "remnants of decomposed vulture carcasses" from the enclosure for the tiger Doc and noted that, at the time, the facility "was experiencing an outbreak of Highly Pathogenic Avian Influenza which caused the death of the vultures." The USDA inspector noted that "failing to remove the carcasses from the enclosures does increase the risk of disease transmission to the tiger … which could significantly negatively impact their well-being."

77.    On November 9, 2022, the USDA initiated AWA enforcement action against Noah's Ark in the form of an Official Warning for failure to remove and dispose of "animal and food wastes, bedding, dead animals, trash, and debris." The official warning noted that providing a sanitary environment for the animals is necessary to "minimize vermin infestation, odors, and disease hazards."

78.    Noah's Ark's documented unsanitary conditions and failures to take adequate precautions to prevent exposure to avian flu necessarily harms and harasses all of the protected big cats, bear, primates, and birds at the facility. Indeed, exposing ESA-protected animals to unsanitary conditions and a "high degree of infection risk" from potentially fatal infectious diseases harms and harasses them in violation of the ESA.

H.    **DEFENDANTS HARM AND HARASS ESA-PROTECTED ANIMALS BY PROVIDING WOEFULLY INADEQUATE STAFFING AND CARE.**

79.    Animal care, including the care of the primates, was noted in the September 15, 2022 USDA inspection report as "being carried out by 3 new employees hired approximately 2 months before the inspection. A facility representative pointed out the assistant director as the supervisor for these individuals. When asked, the assistant director was not aware of this responsibility. Without adequate supervision, the new employees may not receive proper training and guidance on how to care for the animals."

80.    The employees who provide husbandry practices and care, or handle nonhuman primates, must be trained and supervised by an individual who has the knowledge, background, and experience in proper husbandry and care of nonhuman primates to supervise others. A fundamental lack of required staffing and staff training was again noted in the December 2022 USDA inspection: "It is the facility's responsibility to adequately train their employees and assess their qualifications before allowing them to conduct any task especially those involving animal interaction. The facility must ensure that there is enough adequately trained employees to maintain an acceptable level of husbandry practices while under the supervision of someone with a background in animal care."

81.    Inadequate staffing for complex animals like the protected

species of nonhuman primates who are housed at Noah's Ark is particularly problematic during an infectious disease outbreak. Adequate care under these circumstances calls for steps to protect the nonhuman primates from exposure to infected wild birds and bird feces, preventing and mitigating transmission between potentially infected nonhuman primates, rapid identification of clinical signs and rapid management of clinical disease if a nonhuman primate becomes infected, while also protecting the humans providing care from infection.

82.    Failure to ensure consistent care by an adequate number of appropriately trained individuals with specific knowledge of the species housed at Noah's Ark harms and harasses the protected animals and constitutes an illegal take in violation of the ESA.

## I.    DEFENDANTS HARMED AND HARASSED A SPIDER MONKEY BY PHYSICALLY ABUSING HIM AND DENYING HIM POST-ABUSE VETERINARY ATTENTION.

83.    Noah's Ark's current Vice President and Director of Operations Jay Allen grabbed a 35- year-old spider monkey named Clark Gable, slammed the ESA-protected animal onto the floor, then tossed Clark Gable into an enclosure in an apparent fit of anger following the primate's escape into a food prep area.

84.    The attending veterinarian was not contacted about this event, denying veterinary care to this ESA-protected monkey.

85.    Physical violence and abuse of the geriatric ESA- protected primate, and subsequent denial of veterinary attention, constitutes illegal harm and harassment of Clark Gable in violation of the ESA.

### J.    DEFENDANTS HARM AND HARASS PROTECTED ANIMALS BY FAILING TO HAVE AN ADEQUATE PROGRAM OF VETERINARY CARE.

86.    Dr. Karen Thomas served as the USDA-APHIS designated Attending Veterinarian for decades, until Vice President and Director of Operations Jay Allen fired her while she was attempting to count birds after the tornados in January 2023. Dr. Thomas worked with a team of veterinarians, including Dr. Jack Kottwitz who served as a consulting veterinarian from 2014 to 2022. On August 9, 2022, Dr. Shelly Lakly misinformed Dr. Kottwitz via telephone call that Dr. Thomas had "quit" as the attending veterinarian at Noah's Ark.

87.    On Wednesday, August 9, 2022, Dr. Thomas was "voted off" the board of directors and prevented from entering Noah's Ark. These were the beginning days of the Avian Influenza outbreak, preventing the initial response and veterinary care needed to mitigate the disease outbreak. The USDA-APHIS inspection on September 15, 2022, showed continued confusion under Dr. Shelly Lakly as to who the attending veterinarian for Noah's Ark was, despite Dr. Thomas continuing to try to provide veterinary care however possible.

88.    Dr. Thomas was confirmed as the Attending Veterinarian/Veterinarian of Record by Dr. Shelly Lakly via email on October 4, 2022, yet an ongoing pattern of refusal to answer emails

requesting new staff names, training, experience and providing necessary staffing for providing medical care continued through January, 2023.

89.    While holding out Dr. Karen Thomas as the attending veterinarian despite not having re-hired her, Dr. Shelly Lakly continued to use other veterinarians at her whim, while failing to inform or consult with Dr. Thomas as the attending veterinarian.  Requirements such as updating emergency and contingency plans as staffing changed, and changes in the diets of the animals, were made without the attending veterinarian's knowledge or approval.

90.    Failure to have a consistent program of veterinary care provided by veterinarians with adequate knowledge and experience with the species constitutes an illegal take in violation of the ESA.

91.    Failure to have a consistent program of veterinary care provided by veterinarians with adequate knowledge and experience with the species constitutes an illegal take in violation of the ESA.

92.    The United State Department of Agriculture (hereinafter "USDA") has made public a report which recites several additional violations by the defendants.  This USDA report was made after a visit to Noah's Ark on September 12, 2023.  The USDA report notes the following deficiencies and violations:

a. There is no written program of veterinary care for the birds in the custody of Noah's Ark in violation of 9 CFR §2.240(a)(1).

b. Inadequate care of the animals by a veterinarian in violation of 9 CFR §2.40(b)(3). ***The USDA identified this as a repeat violation***.

c. Inadequate cleaning as well as structural integrity deficiencies were noted in two different areas used to house animals in violation of 9 CFR §3.75(c)(1)(i);

d. In another violation ***identified by the USDA as a repeat violation***, the fencing used to enclose dangerous animals  were found to be deficient in the following manner in violation of 9 CFR §3.127(d):

    i. There was a gap four feet long and one foot deep in the area housing a grizzly bear[1];

    ii. There was a hole in the fence housing the black bear which was approximately 1/3 of the length of the fence;

e. The were deficiencies found in the other fencing housing primates and non-dangerous animals in 6 different areas also in violation of 9 CFR §3.127(d).

f. The big cats within the custody of Noah's Ark were not being properly fed and their diet was not being supervised or approved by the attending veterinarian (as required by section 3.129(a)).  According to the USDA report, the Noah's Ark unilaterally and without approval

---

[1]    The bear living in this enclosure has already escaped from this poorly maintained enclosure once.  And while catastrophe was avoided then, the next time the animal escapes, disaster might follow.

changed the diet and the supplements for 3 tigers and a lion (all of which are animals covered by the ESA). All of the foregoing is in violation of 9 CFR §3.129(a). **The USDA identified this as a repeat violation**.

g. There were deficiencies in the housing of several birds. The USDA report finds violation of 9 CFR §3.150(c)(2) and warns that the inadequate shelter exposes birds to "extreme weather conditions which could cause discomfort, illness or distress to the animals."

93.    The interests of justice demand that all of the many violations of the ESA be brought before this Court. The problems at Noah's Ark are multiplying. The defendants are not making the situation better as evidenced by the repeated violations found by the USDA.

94.    The actions and omissions of the defendants evince a continued pattern of harassment of the protected animals housed at Noah's Ark.

95.    The animals under the care of the defendants are likely to be exposed to further stress and disturbances. This harassment continues unabated – it is constant and is worsening day by day. The harassment of the protected animals is occurring at the places the animals are housed (*e.g.*, the lack of maintenance of the pens that house the animals) and the manner in which they are fed (*e.g.*, modification of the animals' diets without the input of or adherence to the orders of a veterinarian). It is

expected that protected animals will continue to suffer, become infirm and die as a result of the continuing stress and disturbance. The nature and duration and/or intensity of the animals' response is a significant disruption of their behavior patterns which include, but are not limited to, breeding, feeding, or sheltering and resting. The Court's attention is directed to NATIONAL MARINE FISHERIES SERVICE PROCEDURAL INSTRUCTION 02-110-19 (dated December 21, 2016).

96.    In addition to the acts and omissions previously alleged, defendant Lakly, as well as other employees of the corporate defendant, now face criminal charges in the State Court of Henry County for a variety of charges as set out below:

- *State v. Lakly*; 2023-SR-3518 [14 counts of Cruelty to Animals]

- *State v. Lakly*; 2023-SR-3550 [8 counts of Cruelty to Animals]

- *State v. Allen*; 2023-SR-3551 [8 counts of Cruelty to Animals]

- *State v. Bozeman*; 2023-SR-3552 [8 counts of Cruelty to Animals]

- *State v. Lakly*; 2023-SR-3569 [1 count of Reckless Conduct]

- *State v. Hill*; 2023-SR-3719 [1 count of Reckless Conduct]

97.    The allegations set forth in the Accusations in those cases are incorporated herein by reference. The acts and omissions alleged by the State in those cases clearly constitute continuing harm to the ESA protected animals and fall within the penumbras of the previously alleged

harassment.

98.    In addition to the foregoing – the protected animals are not receiving proper veterinary care.  By way of illustration and not by way of limitation, the aforementioned tiger (Sheila), who died of kidney failure, was sedated on a weekly basis in the months leading up her death.  This repeated sedation was wildly outside the appropriate standard of care and almost certainly caused stress to the animal and likely hastened her death.  Clearly and without a doubt this abuse of Sheila constitutes not only harassment but also a taking under the ESA.

99.    The defendants' behavior constitutes harassment and a taking under the ESA.  The defendants' "conduct gravely threatens or has the potential to gravely threaten the animal's survival". (See *e.g.*, *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1144 (11th Cir. 2018).

## CLAIMS FOR RELIEF

## COUNT ONE: UNLAWFUL TAKE OF ESA-PROTECTED ANIMALS

100.    The allegations set forth in the preceding paragraphs are hereby realleged and incorporated by reference herein.

101.  Defendants' ongoing practices of: depriving tigers and a lion of veterinary care and adequate nutrition; feeding tigers contaminated food; forcing tigers and bears to live in unsanitary condition; failing to prevent tigers, a lion, and a bear from exposure to potentially deadly avian influenza virus; forcing nonhuman primates and tigers to live in unsafe and unsecure enclosures; failing to protect ESA-listed psittacines from a high infection risk from highly pathogenic avian influenza; failing to provide care to protected psittacines from a high infection risk from highly pathogenic avian influenza; failing to provide adequate staffing and care for ESA-protected animals; physically abusing a spider monkey; and failing to have an adequate program of veterinary care in general harms and harasses protected species of big cats, birds, nonhuman primates, and a bear and violates the "take" prohibition of Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B).

102.  Pursuant to 16 U.S.C. § 1540(g)(1)(A), this Court has the authority to issue an injunction prohibiting Defendants from further violating 16 U.S.C. § 1538(a)(1)(B), and ordering them to relinquish possession of the protected animals to a reputable sanctuary.

## COUNT TWO:
### UNLAWFUL POSSESSION OF TAKEN PROTECTED ANIMALS

103.  The allegations set forth in the preceding paragraphs are hereby

realleged and incorporated by reference herein.

104.   Defendants' continued possession of the protected animals in its custody, who have been taken as set forth above, constitutes a violation of 16 U.S.C. § 1538(a)(1)(D).

105.   Pursuant to 16 U.S.C. § 1540(g)(1)(A), this Court has the authority to issue an injunction prohibiting Defendants from further violating 16 U.S.C. § 1538(a)(1)(D) and ordering them to relinquish possession of the protected animals to a reputable sanctuary.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

a. Enter a declaratory judgment that Defendants' treatment of protected animals violates the ESA's prohibition on the "take" of an endangered species set forth in 16 U.S.C.§ 1538(a)(1)(B) and corresponding regulations;

b. Enter a declaratory judgment that Defendants have violated and continue to violate 16 U.S.C. § 1538(a)(1)(D) and corresponding regulations by continuing to abuse, neglect and mistreat ESA-protected animals;

c. Enjoin Defendants pursuant to 16 U.S.C. § 1540(g)(1)(A) from continuing to violate the ESA and its implementing regulations with respect to endangered animals;

d. Enjoin Defendants from owning or possessing any endangered species in the future;

e. Appoint a special master or guardian ad litem to determine the most appropriate placement for the forfeited animals, consistent with the animals' best interests, at wildlife sanctuaries that are accredited by the Global Federation of Animal Sanctuaries or are

otherwise reputable and that will provide animals adequate care based on their unique species-specific needs;

f. Award Plaintiffs their reasonable attorneys' and expert fees and costs for this action;

g. Grant such other and further relief as the Court deems just and proper.

/s/*Richard D.C. Schrade Jr.*
Richard D.C. Schrade, Jr.
Georgia Bar No. 629779

146 Atlanta Street
McDonough, Georgia 30253
770.898.2723
richard@schradelaw.com